May it please the Court, Kathleen Harchi on behalf of Petitioner Milton Bruce Scott, and I'd like to reserve five minutes for rebuttal. Now this is a case that, in the prosecutor's own words, was dead in the water absent the inadmissible Combs tape, and it's a case that was so close that two prior juries had already failed to convict Mr. Scott. And these two points go directly to the question at the heart of this case, and that's whether a reasonable judge could conclude that there was no reasonable probability of just one juror declining to convict Mr. Scott absent the Combs tape. That's the standard set forth by this Court in Vega v. Ryan, and under that standard Mr. Scott respectfully submits that on this record it would be unreasonable to conclude that there was no such reasonable probability. So what we're really looking at is prejudice? Yes, that is the only... That's correct. And that there was a concession that the tape was inadmissible, it was an admissible hearsay and the state has conceded that point. And there's also essentially a concession here that Inspector Wastany's testimony was not admissible at the second trial. Well, I just wanted to boil it down because we're not really talking about now the first prong of the analysis, only the prejudice prong. That's correct, Your Honor. And here's why... And we're looking at the prejudice prong and a failure to object. We're looking at the prejudice prong, yes, we are evaluating counsel's failure to object to the inadmissible Combs tape, yes, Your Honor. In other words, we're looking at prejudice, we've got counsel right there at the record and not making any objection on the third trial. That's correct, Your Honor. And Combs had refused to testify. Yes, he invoked his Fifth Amendment right. The state then introduced Combs' testimony from the first trial. Correct. And then played Combs' tape to the jury. Yes, as a prior inconsistent statement. What we have is testimony which Combs had given at a prior trial and then testimony... Well, and then conversation Combs had had with others about this testimony he'd previously given in another trial. The tape was... I'm not sure... So the tape was from prior to any of the trials? Yes, but it was... Well, it was to other people, but at trial he'd said one thing and to show that what he said there was false, then this tape was then allowed to come in. Correct, Your Honor. Is this direct evidence? Is this direct evidence? You mean is it... The tape. The tape was considered for the truth of the matter asserted. Is it direct or is it impeachment? The evidence was... It came in as a prior inconsistent statement, but importantly the court instructed the jury that Combs' tape was admitted for the truth of the matter asserted as to the matters within that tape. So really it was impeaching evidence? The evidence... And then the tape was admitted for impeachment of that direct evidence. Your Honor, that's the... You're correct that that's the rule that enabled the prosecution to get the tape into evidence, but importantly... I think that's pretty important because now we're talking about prejudice, and we're talking about prejudice with a failure to object, so we have to put it in perspective in my determination. So that's why I want to make sure where you are. Yes, Your Honor. The critical point here is that the jury was explicitly instructed that it could consider everything that Combs said for the truth of the matter asserted, such that it was substantive evidence in the third trial. Well, but what it really was, it was really impeachment of what he'd said pre... At trial, in the first trial, it was impeachment of that testimony. And what we're trying to say, or what we're called upon now to say is, is this impeaching evidence of what he said in the first trial, is it prejudicial and with a failure to object? That's what I'm trying to do, is lay the groundwork. Yes, Your Honor. Because then what's my standard of review? The standard of review is the one set forth in Vega v. Ryan, which is whether a reasonable judge could conclude that there was no reasonable probability of just one juror declining to convict Mr. Scott. And this is where the two prior hung juries come in. We know that this was an exceedingly close case because two juries had already failed to convict Mr. Scott on the record. We know about those hung jurors, but if we're really down to that, we have evidence here that his credibility was impaired when he admitted he'd created a false alibi and lined up witnesses to testify about the false alibis. We have evidence the video gave no indication that the victim said anything to Scott. Scott was calm throughout the time he was in the store. He left the store, he got in the car, and he drove away. He went back five minutes later with a loaded gun. Upon seeing the victim, he ran up to him and started shooting, chased the victim around the car, and shot him 13 times. That's the evidence, notwithstanding all this stuff you're arguing about. Are you suggesting that a reasonable jury couldn't convict Scott on this evidence? No, Your Honor, I'm not suggesting that, and that's because critically... Well, if in fact a reasonable jury could convict him on the evidence I've recited to you, isn't the case over? No, Your Honor, it's not, and that's because the standard isn't whether a reasonable judge could have convicted Mr. Scott. This is not a sufficiency of the evidence case, and in fact the Supreme Court emphasized in Woodford v. Viscotti that the question is not whether the petitioner has proved that it's more likely than not that the outcome would have been altered. What we need to look to is whether there was a reasonable probability of just one juror declining to convict, and Your Honor laid out the facts as the prosecution laid them out at trial. The reason I did is because it seems to me that when you ask the question you're asking, and we put in this question that we're looking at prejudice, and we put in this question that it's a failure to object, and we add to it the overwhelming deference I've got to give to the California Court of Appeal and the Supreme Court, then I ask you these questions, and that's why I wanted you to respond. Absolutely. Because I've got two courts to whom I owe great deference saying you're dead wrong. Well, Your Honor, the issue with the analysis conducted by the courts below, we don't have a reasoned decision, but two prior juries had already credited Mr. Scott's testimony, or at least there was one person on each of those juries, and in the second trial we had How do we know that? You assume it, but we've been very careful to say that we don't make assumptions of why the jury did a certain thing. They may have had an entirely different reason for each time that the jury hung. We simply don't know. We're not allowed to speculate, so how can you make that divining idea for us? Well, the fact of the matter is that on two prior juries, at least one person did harbor a reasonable doubt, and that's why we had hung juries here. We don't know why. But we do know that at least someone did harbor a reasonable doubt, and so The only difference between this trial and the other trials, this tape? It was not, Your Honor. In the first trial, Inspector Wassonee's testimony was admitted in lieu of the tape, and in the second trial, we had the tape, and in all three trials, the prosecutor relied heavily on the tape, and this is especially true in the third trial. In Mr. Scott's cross-examination, the prosecution hit on this point very hard, hit on the Combs tape, hit on the tape again in closing, and hit on it again in rebuttal, and this was a piece of evidence that should have never come in that thoroughly infected that trial. And so there is, and so given that record, and if you remove all references to the Combs tape in the third trial, it simply can't be, it must be the case that that trial was weaker than it was in the first two trials, and each of those juries hung. Now back to your point about the I guess my big problem with what you just said is I agree we have to do some comparison, but when we do the comparison, we compare evidence actually presented with what would have been presented notwithstanding this problem. So I gave you the evidence that would have been presented notwithstanding this problem, and then I get to the point, why could I say that a reasonable judge would have done anything different than what happened here? The reason, Your Honor, is that the facts that you laid out very well were all presented to two juries already, and those juries declined to convict Mr. Scott. And here we owe deference to the jury as well. We know, this is why we have juries. We weren't in the room when Mr. Scott was being cross-examined by the prosecutor, and we weren't there to hear all of the other evidence, to hear the two sides and to hear just how close this case was. And this case was so close that two juries on substantially similar evidence to that already failed to convict Mr. Scott. The attorneys were the same? The attorneys were the same throughout the trials, yes. And we have two courts to whom I owe deference, California Court of Appeal and the Supreme Court, who deny the IAC. They did, Your Honor. On the same arguments. They did. There was a separate... The same arguments, or I've got to send it back. Your Honor, the claims have been the same throughout this proceeding, Your Honor. All right. So, and then I owe deference to them. Absolutely. Making these determinations as the Supreme Court President, but I'm saying they did it badly. That's what you're asking? That's correct, Your Honor. And simply on this record, where we have two juries who already failed to convict Mr. Scott on substantially similar evidence, if you take out the evidence from the third trial that was the centerpiece of the prosecution's case, where the prosecution relied it on every turn and said that the case was dead in the water without it, if this is not a case where there is prejudice under even the deferential AEDPA Strickland standard, there simply is no case that can meet this bar. And I'd like to reserve the remainder of my time. Oh. What do we do with the argument that there's just overwhelming evidence of his guilt? That argument is made, and I think just looking at all of the evidence that there is there of what took place, my colleague Judge Smith outlined some of it, why wouldn't we take the position that there was no prejudicial error because of such overwhelming evidence of first-degree murder, especially the 13 shots? Well, Your Honor, this court already stated in Vega v. Ryan that whether a jury had a difficult time reaching a verdict is an indicator of prejudice. And here, all of this evidence that we're discussing now... Well, that's in another case. But here, just take it as if it's true, there's overwhelming evidence of first-degree murder. If it's true, then why would there be prejudice? There would be prejudice because Mr. Scott doesn't need to show that the jury would have reached a different result, only that there was a reasonable probability of a different result. Just one juror declining to convict, and we don't... And I just wanted to emphasize again that two juries already heard this and hung such that the evidence can't be overwhelming. I've heard that a number of times, but where did the State say that their case would be dead in the water without the tape? That is at 11 ER 2384. And unless the Court has further questions, I'll reserve the remainder of my time. Thank you. All right. You've got a minute left. May it please the Court, Peggy Ruffray from the Attorney General's Office for Respondent. Your Honors, this is a complicated case on the performance prong, but the ultimate resolution is relatively straightforward because the prejudice prong is so straightforward. The defendant has not bet his burden to show prejudice under the doubly deferential ADPA standard. We're not conceding the performance prong, but Strickland itself says that if it's easier to dispose of an ineffective assistance claim on the prejudice prong, the Court should do it, and that's what we think should happen here. Our position is that even if the Combs tape had not been admitted at all, the State Court could reasonably conclude that there was no reasonable likelihood of a different result, the first-degree murder result, for four reasons. And all of these reasons I'm about to discuss are not dependent on the Combs tape in any way. First of all, the undisputed facts of the offense. This is classic premeditation and deliberation. Scott happened to run into his arch-rival at this store. He left, and he could have simply driven away, but instead he got a loaded gun, did a U-turn, came back five minutes later, ran over to where the victim was getting out of the store, chased him around the car, fired 13 shots, including a shot in the back, and left him dead on the sidewalk. Much of this was confirmed by the videotape. That is classic evidence of premeditation. Why did the jurors, why did the first two juries hang him? The evidence came in differently in this trial. The tape did come in, but the evidence came in differently, and the prosecutor's cross-examination in the third trial was much more effective and aggressive, not just about the Combs statement but also about the concocted alibi, about Scott's constantly evolving story. First it was going to be alibi, then it was that he thought maybe the victim was reaching in his car for something, but he didn't know what it was, and by the third trial he was saying, I'm positive that he was reaching in his car for a submachine gun, and the prosecutor very effectively capitalized that on the third trial. In the first trial, the cross was 44 pages. In the second trial, the cross was 64 pages. In the third trial, it was 107 pages. So it was much different, and this jury only deliberated for less than a day before they convicted him of first-degree murder. So the evidence was simply different. So that's your first reason? The undisputed facts of the offense, yes. The second is the motive evidence, which was very strong. There had been years of rivalry between the defendant and the victim over this woman, Christine Romero. She had a baby with the victim, who was 10 years old at the time of his death. Then she was dating the defendant. Then she went back to the victim, got pregnant with his baby, and then aborted that baby, and then went back to the defendant again and had his son. So there was this very strong rivalry between the two of them. And also, the defendant was a gangster rapper who had written these rap lyrics in 2004, long before this offense, about hopping out of a car to shoot and kill a, quote, bitch stealer whose baby mama was a switch hitter who would ultimately be back with him. And there's other very graphic violence in those rap lyrics that I won't repeat here. But the state court found that that evidence showed premeditation and deliberation. He was writing a song about this and about this situation and about killing his rival even before this actually happened. Next, there was Scott's own testimony, where he conceded that there was no immediate threat in the store. He didn't think that the victim was going to shoot him right there in the store or was going to shoot his son. And under California law, you have to have immediate danger for self-defense. So his own testimony defeated his claim of self-defense. He also kept embellishing his alleged fear and the victim's alleged threats. And that came through through this extensive cross-examination that his story was evolving and changing. Given the questions we must ask to make this decision, the defendant keeps saying the first two trials were hung jurors. How can you say, asking the questions you must ask, that we should not get another chance because of prejudice? Well, as I say, the evidence came in differently at the third trial. So yes, the first two juries were hung. But the prosecutor didn't do as good a job of cross-examination in the first two trials. The third jury saw the case differently because of this 107-page aggressive cross-examination. I'd also like to address the point about the prosecutor did make this remark in closing argument. We made a deal with Marcus Combs. His interviews and conversations were already documented, and we were able to impeach him with prior statements. His testimony was necessary. Without Marcus Combs, this case doesn't go. It's dead in the water. Because Griego doesn't testify either, neither one of them openly answered questions in court. That's a problem for the prosecution. It's an obstacle. It's not insurmountable. That was his entire statement about that. In our district court argument, habeas counsel actually conceded that the prosecutor was just being dramatic. That's at ER 124. And I think that's clearly what was happening here, because Combs wasn't even mentioned at the preliminary hearing. At the time the first trial started, they didn't know if he could even be found. He was arrested the day before and brought in in custody. So the prosecutor was going forward with the case, even without knowing if Combs was going to testify, even without knowing what he would say, if he was going to incriminate the defendant or not. So that one statement... It certainly called attention to the statement, didn't it? It did, and he was relying on it because it had been admitted. But to say it's dead in the water, that was clearly hyperbole in the context of his argument. He wasn't literally saying, I couldn't prosecute this case without the Combs tape, because he in fact did. The trial started and they didn't have the tape, they didn't have Combs, they didn't have any of that. So that's clearly hyperbole, as was conceded in the district court. Wow. Did the state courts say anything about that comment? It was a silent denial, so there wasn't a reasoned opinion on that. So we really don't know. Well, again, I think the court can most easily conclude that the state court found that there was no prejudice in light of all of these factors. The final factor I was going to mention is the evidence that Scott was the aggressor. He had some witnesses that were trying to say that Nelson, the barber, the victim, was this very threatening man. But all of those witnesses were either his girlfriend, his mom, or a friend who had been in custody with him. And the jury knew that he had lined up people at the first trial to lie for him and testify to an alibi defense, which didn't ultimately materialize. But he admitted that he had gotten these people, they were ready to go, they were ready to lie. So the jury was aware that he could have done the same thing with these other witnesses. And the evidence was undisputed that the victim was scared of him because he thought he had shot him in the leg before. And the victim was so scared that he fled to Michigan and was living there. He had come back just coincidentally to attend his daughter's birthday party, but even then he was so scared he didn't stay with his girlfriend, he stayed in a hotel. So there was this very strong evidence that the defendant, this swaggering gangster rapper who the victim at least believed had shot him before, it was the defendant who was the aggressor, not the barber. And in fact, I think it's dubious that he even made this alleged threat in the store. The jury could have seen through that as well. This man who was so scared that he moved away, he happens to meet his arch rival that he believes has shot him before there in the store. And yet he says to him, you and your son are dead? The defendant's with another person. There's two against one. And he's the person who's moved away. I think the jury could have also seen that that's unlikely. But even if it was, the defendant defeated his claim of self-defense by saying, I didn't think he was going to do anything right there in the store. And you have to have immediate danger to be able to shoot somebody in self-defense. Did the jury hear Combs' direct testimony in the second trial? Yes. They read his testimony from the first trial, yes. But as I say, the difference was that the cross-examination of Scott was much different. It came in much differently at the third trial. That's what the district court recognized in differentiating between the first, second, and third trials. In the first trial, counsel said he was going to present this alibi defense, that Scott had acted in self-defense. And then after everything came out the way it did, Scott took the stand and he didn't really testify about an alibi, correct? Correct. And how was that presented in the second trial? Well, Scott testified at all three trials. But there's no alibi. Counsel didn't get up and say anything about an alibi defense in the second trial or the third trial. Right. By the time of the second and third trials, Scott had already testified at the first trial, and so the defense had shifted at that point to self-defense. So, really, there was a difference in the first and second and third trials in that counsel in the first trial said there was going to be an alibi defense, but actually there never was. Correct. Okay. And he was cross-examined about that. Yes, he was, although, oddly enough, he wasn't cross-examined that much or that effectively at the first trial. The prosecutor really hammered on that, especially in the third trial, the fact that he personally had gotten these witnesses lined up and participated in concocting this alibi that then he abandoned and said that he was, in fact, the shooter when he had these people lined up to say that he was actually in a different place and was nowhere near this store at the time of the shooting. Well, the reason I ask you about that, it seemed to me that the prosecutor's work in the third trial about the failure to present the alibi defense and the many things that Scott went out and did in order to put that defense together was tremendously more, if it was pointed out, how much he did to try to mislead the jury. Correct. Yes. That was the very effective and aggressive cross-examination that happened in the third trial, which I think was why this jury, the third jury, deliberated for less than a day. I could talk about the performance prong, but that is much more complicated, so unless the Court has questions, I'm prepared to submit. I don't believe the defendant has raised the performance prong in this appeal, have they? There was discussion about it, and we did not concede it. The district court said that the performance was clearly deficient. The district court did find ineffective assistance for failure to object on the best evidence rule. We contend that that's not exhausted. But I know you contend that, but they didn't even appeal that. They didn't appeal that ruling, nor did you. Only thing I have in front of me is the prejudice prong. Well, we did disagree with the district court's ruling in our... You may have disagreed, but you didn't appeal it. Well, we're not required to cross-appeal, if that's what the Court's getting at. We're not required to cross-appeal each prong of the ineffective assistance claim. Once the district court finds deficient performance but no prejudice, we can simply dispute that in our briefing in the Ninth Circuit. That's what I wanted to make sure you were saying. Yes. All right. Thank you, Your Honor. One thing I wanted to emphasize that came up during Ms. Rupert's presentation is that there were no material differences between the second and the third trial that were discussed. Everything that we discussed just now was a substantial difference between the first and the third trial, and that's what the district court concluded, was that there were some meaningful differences between the first and the third trials. But if you look at the alibi cross-examination at the second trial, that was a rigorous cross-examination. And I'd like to point, Your Honor, to 15 E.R. 3300 to 3309 on that point. And also all these inconsistencies between the first and third trials, the prosecutor hit heavily on those very same inconsistencies at the second trial, and yet that jury hung. And critically, to the extent that the cross-examination was more effective at the third trial, it's prosecutor relied heavily on an inadmissible Combs tape in cross-examining Mr. Scott about that alibi. And just to put this point in context, this is E.R. Volume 11. This has the cross-examination, the prosecutor's closing, and the prosecutor's rebuttal. Each of these tabs has a reference to the Combs tape or to the statements that only came from that tape. So it really is something that infected the third trial. So to the extent that that case was more effective, it's because of heavy reliance on the inadmissible tape. And at the end of the day, even though there was overwhelming evidence, in Your Honor's words, of first-degree murder, a jury was certainly entitled to credit Mr. Scott's testimony that he feared for his and his son's life, that he left in a rage. He thought he had seen a ghost because he thought Nelson had left the state. He turned around because he was going back to Combs' house, which was towards the liquor store. Once he turned around, he saw the truck pointing in the direction of his home, and he felt the urgent need to go confront him, didn't know what he was going to do, brought a gun for protection, and opened fire only when he saw him reach into the truck. Thank you. Thank you, Your Honor. Thank you for your argument. The case of 1515240, Scott v. Arnold, is submitted.
judges: Wallace, Schroeder, N.R. Smith